IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| RODNEY LEWIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:04-cv-1011-WKW |
| | ) | |
| PENSKE LOGISTICS, L.L.P., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is defendant Penske Logistics, L.L.P.'s Motion for Summary Judgment (Doc. # 41), and  Motion to Strike, in part, Declarations of Douglas Birl and Gregory Blocton and Affidavit of Robert Davis (Doc. # 66).  Also before the court is plaintiff Rodney Lewis's Motion to Strike the Declaration of Noel Cann and, in part, the Declaration of Jason Smith (Doc. # 59), and Motion to Strike, in part, Defendant's Reply Brief (Doc. # 68).   For the reasons that follow, Penske's Motion for Summary Judgment (Doc. # 41) is due to be GRANTED, and all other referenced motions (Docs. # 59, 66, & 68) are rendered MOOT by entry of summary judgment in Penske's favor.

## I.  FACTS AND PROCEDURAL HISTORY

This action charges employment discrimination and retaliation under 42 U.S.C. § 1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII").[1]  Lewis alleges that Penske discharged him because of his race, and because he filed an EEOC

---

[1]  Plaintiff alleges that the defendant not only discriminated and retaliated against him in violation of Section 1981 and Title VII, but also in violation of Title IX and 42 U.S.C. 1983.  Title IX applies only to discrimination on the basis of sex in an "education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681.  Further, to properly allege a Section 1983 claim, the plaintiff must allege that the defendant acted

complaint. The court construes the facts of this case in the light most favorable to Lewis as the non-moving party.

Penske employed Lewis, a black male, as a truck driver at its Montgomery Logistics Center on or about May 15, 2000. Lewis's supervisor was Gordy NeSmith ("NeSmith"). Lewis resigned his position with Penske in February, 2001, and concentrated his efforts on starting his own business. Lewis testified that the decision to leave Penske was not based upon any perceived problems that he had with the company. (*See* Pl.'s Dep. 111:14-17.) Unfortunately, the life of Lewis's new venture was short and he returned to employment with Penske around September 6, 2001, in his former position. In the meantime, Penske experienced changes in management. Jeff Moss took control as the Logistics Center Manager, but NeSmith remained in a supervisory role over Lewis.

In November, 2001, Penske began an audit of expense account monies of all truck drivers which eventually led to the suspension of one Hispanic and seven black drivers, including Lewis, pending the outcome of the audit. As a result, on July 11, 2002, Lewis and other suspended minority employees filed a Charge of Discrimination with the EEOC. Contemporaneous with the EEOC filing, Lewis resigned. In a letter dated July 10, 2002, Lewis asked Moss to "accept my resignation, effective July 10, 2002, as a driver for Penske Logistics." (Def.'s Ex. A., Resignation Letter.) The letter further stated that working at Penske was a "valuable and rewarding experience." (*Id.*) Lewis claims that he copied the letter "from another person who wrote it" and signed it "so that it wouldn't show up on [his] driving record as a termination." (Pl.'s Dep. 116:11-13, 17-19.) Further, Lewis

under the color of state law. *See Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1303 (11th Cir. 2001). Both Title IX and Section 1983 are inapplicable to this action because the plaintiff has not alleged (1) that the defendant receives or received Federal financial assistance and subsequently discriminated against him because of his sex, and (2) that the defendant discriminated against him under the color of state law. Plaintiff's complaint is therefore limited to his allegations of discrimination and retaliation under Title VII and Section 1981.

alleges that Moss threatened him with termination or suspension if he did not sign the letter. Notwithstanding whether Lewis resigned or was suspended from Penske, Lewis and the company subsequently reached a settlement as to the EEOC charge. Penske agreed that it would reinstate various drivers, including Lewis, with back-pay as of August 2, 2002. Lewis agreed to pay to the company monies identified in the audit investigation that were allegedly taken without authorization.

## A.   *Allegedly Defective Truck*

At the time of his reinstatement, Moss assigned truck number 226421 ("226421") to Lewis after briefly assigning a newer truck to Lewis. Moss subsequently reassigned the newer truck to James Logan ("Logan") on the same day. Lewis claims that Moss knew that 226421 "had some problems", but still required him to drive it. (Pl.'s Dep. 104:10-13.) Lewis alleges that on the day that he was given 226421, he complained to Moss that it had major problems. Allegedly, Moss told Lewis to "just drive it; it's been fixed." (*Id.* 156:17-19.) At no time did Lewis tell anyone at Penske that 226421 was unsafe, although he did state that the he feared that he might have a wreck while driving the truck. (*Id.* 182:7-9, 180:6-12.) According to Lewis, 226421 had a litany of problems, including cutting off while Lewis was in Dalton, Georgia, Florida, and Mobile during 2003, and the engine spontaneously catching fire. Additionally, Lewis complained both to the mechanics at Penske and individuals in Penske's office that 226421 would cut off on him. Moreover, Lewis called Penske's S.O.S. telephone number for roadside assistance numerous times, submitted a plethora of Driver's Vehicle Inspection Reports ("DVIR") to initiate the repairs on the truck, and complained to Penske of alleged defects including that the engine was overheating, the truck was losing power, and the engine would fail. At the time that the engine caught fire, Penske repaired the damage. However, one month later Lewis complained that the engine was overheating.

3

The mechanics at Penske inspected the truck and left the question as to what caused the engine to overheat open for debate. Lewis alleges that even though the truck was repaired, it was still defective as suggested by the failure to determine why the engine was overheating.

Penske allegedly assigns trucks to drivers based upon seniority with the company. Moss asserts that Lewis was given 226421 because of his lack of seniority with Penske. Although Lewis was initially hired in 2000, Penske used his last hire date of August 2, 2002, as a basis for the assignment of the truck. On the day that Lewis was assigned 226421, Logan had worked for Penske since 1998, while Lewis, at best, had worked at Penske since 2000. Although Lewis does not allege that the defective truck was given to him as a result of a pattern of discrimination on the part of Penske, he does, however, allege that the defendant knew that the truck had problems. (*Id.* 104:5-13.)

**B.      *Accident and Discharge***

On January 2, 2004, Lewis was driving 226421 on Highway 80 through Selma, Alabama. The exact circumstances that happened on Highway 80 are in contention. Lewis claims that "a car cut in front of [him] . . . and [he] applied [his] brakes and the tractor cut off . . . ." (Def.'s Ex. A, Driver's Statement) After the truck cut off, Lewis "cut the truck about 4 to 5 feets [sic] to [his] right and a tree overhanging the Highway caught the trailer and the passenger side front nose and fell on to the tractor on the driver side." (*Id.*) Lewis vigorously avers that the accident was not preventable. On the other hand, Penske commenced an investigation into the accident and deemed it preventable. As evidence for its conclusion, Penske refers to various inconsistencies with Lewis's recollection of the accident. For instance, Gary Nuckolls ("Nuckolls"), Penske's Safety Specialist, and Jason Smith ("Smith"), Penske's Logistics Center Supervisor, prepared a memorandum entitled "Accident

4

Preventability."  In the memorandum, Nuckolls and Smith stated that Lewis claimed that he and a

wrecker driver could not start the truck.  However, Nuckolls and Smith allegedly contacted the

wrecker driver who "denied even trying [to start the truck]."  (Def.'s Ex. A., Accident Preventability

Memorandum)  Further, "the [mechanics at Penske] ran a diagnostic fault code on the truck and it

showed no faults and the truck did not shut off."  (*Id.*)  Nuckolls and Smith concluded that Lewis

"did not use his Smith System Keys[2] and it resulted in him not seeing the tree and causing this

accident, which final costs will exceed $18,000."  (*Id.*)  Moreover, the memorandum stated that

"[Lewis] was not truthful in his statement in what happened and did not convey the seriousness of

the accident by the extent of vehicle damage . . . ."  (*Id.*)  Lewis responds by saying that "I never told

Jeff Moss or anyone at Penske that . . . the tow truck driver tried to restart the truck and the truck

would not restart.  I actually told them that the truck had quit running."  (Lewis Aff. ¶ 7.)

Penske defines a major accident "as any accident exceeding $5,000.00."  (Moss Aff. ¶ 2.)

Moss stated that "damages from Lewis' accident were more in the range of $18,000.00, one of the

most significant accidents during [Moss's] tenure."  (*Id.* at ¶ 3.)  As a result of the accident and of

his record with Penske, the company decided to terminate Lewis's employment.  There are various

steps taken by numerous individuals before an individual is discharged from Penske.  Smith testified

that "[m]any persons were involved in the decision that this accident was preventable and that Mr.

Lewis should be terminated."  (Smith Aff. ¶ 3.)  Moreover, Penske's Discharge Process is outlined

as commencing with the associate's supervisor's recommendation of discharge, the HR manager's

---

[2] Smith Systems Keys is a safety process concentrated around five areas of safety concern.  Drivers are to "aim high in steering, get the big picture, keep your eyes moving, leave yourself an out, and make sure they see you." (Pl.'s Ex. 25., Driver Evaluation Form)  Lewis was trained in this system while at Penske as a new hire and received annual reviews, which were rated "Good" by his instructors.  (*Id.*)  In his discharge, Penske stated that Lewis did not observe the "get the big picture" prong of the Smith Keys system.

recommendation of termination, the Area / Department VP's recommendation, and the ultimate decision of discharge.  (Def.'s Ex. D., Penske Discharge Decision Template)  In Lewis's case, the Safety Committee, consisting of Smith, Nuckolls, and five drivers employed with the company, Mike Beck, Harold Franklin, Anthony Stovall, Lamar Arthur, and Leon Moore, considered the preventability of the accident and concluded that the accident was preventable.  Franklin, Stovall, and Moore are African-American, while Beck and Arthur are white.  Subsequently, "[Jason Smith,] Jim Smith, Regional Safety Manager; Randy Ljubi, Ohio Area General Manager; and Paul Penatzer, Vice President of Operations, Southeast Region . . ." all reviewed the Safety Committee's opinion and concluded that the accident was preventable and "most likely caused by driver inattentiveness." (Smith Aff. ¶ 3.)  All of the aforementioned individuals are white.  (*See* Lewis Aff. ¶ 6.)  A discharge template was used by Penske "to further ensure fairness . . . before making the decision to let [Lewis] go."  (Smith Aff.  ¶ 4.)  The template was completed by the Human Resources Manager.  The ultimate decision was to terminate Lewis because of his "past history of unsafe acts, and the nature and severity of this latest accident. . . ."  (Def.'s Ex. D., Penske Discharge Decision Template.) Moreover, Nuckolls testified that the inconsistencies in Lewis's reporting of the accident concerned Penske.

Moss averred that "the major, preventable accident by itself would have been grounds to terminate Mr. Lewis."  (Moss Aff. at ¶ 6.)  This statement is echoed in Penske's Procedure Manual which  states that "[a] major preventable accident will be grounds for discharge. . . ."  (Pl.'s Ex. 21., Penske Procedure.)  Smith stated that "[a] clean history might have saved [Lewis], but [his] file contained citations for logbook failures and falsifications, written warnings for safety concerns, and speeding convictions in his personal vehicle."  (Smith Aff.  ¶ 6.)  As evidence of Lewis's alleged

6

poor driving history with the company, Penske offers various citations that Lewis received from his supervisors.  On November 12, 2003, Lewis received a "10 hour violation" for "exceed[ing] 10 hours of driving time without taking the proper amount of Off Duty time."  (Def.'s Ex. D., Violations From 11/9/03 Through 11/15/03.)  Smith wrote a "DOT Violation Warning" to Lewis on December 19, 2003, about this offense, and stated that "[y]our disregard for Department of Transportation regulations is a federal offense and in direct violation of Company policy."  (Def.'s Ex. D., DOT Violation Warning.)  Lewis signed the memorandum as evidence of his receipt.  Further, on December 10, 2003, Lewis received a violation from a Louisiana state police officer for not having his log book up to date.  Smith wrote a "D.O.T. REGULATIONS- WARNING" to Lewis on December 10, 2003, and stated that Lewis is "hereby issued this written warning.  Further violations may result in more severe disciplinary action, up to and including discharge."  (Def.'s Ex. D., DOT Regulations -Warning.)  Lewis refused to sign the memorandum as evidence of his receipt because he claimed that his log book was current and that "the DOT could not read [his] logs properly."  (*Id.*)  Further, Lewis received an "EMPLOYEE WARNING LETTER" from Moss on July 10, 2003, in regard to an incident in which he received an injury.  "With the radiator still hot, [Lewis] took the radiator cap off [the truck], causing your left wrist to be burned by the hot water."  (Def.'s Ex. D., Employee Warning Letter.)  Lewis was sent to Southeastern Industrial Medicine, and was "taken off a route that was being dispatched that afternoon. . . ."  (*Id.*)  Penske cited Lewis for "lack of safety awareness."  (*Id.*)  Lewis signed the letter as evidence of his understanding.

On February 12, 2002, NeSmith wrote a Memorandum to Lewis with the subject line of "Late Runs."  (Def.'s Ex. D., NeSmith Memorandum.)  NeSmith detailed an episode wherein he was unable to reach Lewis to "pick up a load."  (*Id.*)  NeSmith called Lewis's behavior "irresponsible and

unacceptable", and complained that Lewis "habitually called in sick at the last minute." (*Id.*) Lewis signed the memorandum. On April 16, 2002, Moss wrote a memorandum to Lewis regarding alleged log book falsification. Moss averred that Lewis falsified his log book for March 18, 19, and 20 of 2002. Lewis was suspended for three days without pay and warned that a second occurrence would result in dismissal. Lewis subsequently signed the memorandum as evidence of receipt. Finally, Lewis's driving history shows that he was cited for speeding four times in his personal vehicle - - September 24, 2002; January 8, 2002; July 28, 1998; and July 21, 1997. Lewis was also previously cited for an overweight truck on March 2, 2001, and June 19, 1998.

Although cited various times for violations, Lewis was also commended by his supervisors for doing an excellent job. For instance, Heusman wrote a memorandum to Lewis stating that he became aware that Lewis aided a store manager with unloading the trailer for a delivery. Heusman further stated that "I commend you for doing your job well, and providing excellent service to our customer. This letter will be kept in your employee file to let future managers know of your work efforts. Keep up the GREAT work!" (Pl.'s Ex. 36., Memo from Heusman.) Further, Jason Brewer, a Safety Specialist for Penske, acknowledged that Lewis "did a really good job of using Smith Systems Keys. . . ." (Pl.'s Ex. 37., Email from Brewer) Brewer stated that Lewis "impressed [him]" and he passed this praise up to Jim Smith. (*Id.*) Lewis also received a "safe driver of the month award." (Pl.'s Dep. 25:8-13.)

## C. *Plaintiff's Allegations of Race Discrimination*

Lewis alleges that, while Penske terminated him for a preventable accident and a history of various violations, the company has not terminated white male drivers with allegedly similar records of employment. Lewis points to Paul Berlin, Jeff Boone, and Terry Caudle as alleged proper

8

comparators "because they are similarly situated to Plaintiff in 'all relevant respects.'" (Pl.'s Br. Resp. Def.'s Summ. Judg. at 23 (citations omitted).)

Paul Berlin, a white male driver, had a spotty history with Penske.  Berlin's driving history included a speeding ticket in his personal vehicle on June 15, 2000; an accident in his commercial vehicle on May 13, 2000; a log violation for exceeding the speed limit on October 5, 2000; and "multiple 10 & 15 hour violations" on May 28, 2003.  (Pl.'s Ex. 32, Hours of Service Violation.) Moreover, Berlin was involved in an incident with a Penske security guard where he pushed open the guard shack and made contact with her forehead.  Additionally, Berlin had an accident on February 3, 2004, where he ran over a curb and blew out two tires.  The damage to the vehicle was $275.71 and was deemed a minor preventable accident by Penske.  Berlin received a final written warning and a five day suspension for the accident.

Berlin had a DOT Recordable Accident that involved an Over-the-Road Petroleum Spill on May 14, 2001.  He had been employed with Penske for a total of "ten or eleven months at the time of the accident."  (Pl.'s Br. Resp. Def.'s Summ. Judg. at 12.)  Berlin allegedly rear ended a vehicle while traveling on Interstate 65.  The rear-ended vehicle subsequently rear-ended a second vehicle. The trailer had twelve thousand dollars in damages as a result of the accident.  Lewis claims that the damage to the trailer amounted to $18,399.70, exclusive of any damage to the other vehicles that were involved in the accident.  (*See Id.*)  Further, Penske ruled the accident preventable based upon the fact that Berlin was "[f]ollowing [the vehicle] to [sic] closely . . . ."  (Def.'s Ex. D., Supplemental Accident Analysis Report for Berlin.)  The company suspended Berlin for two weeks, along with issuing him a final written warning.  Moreover, Penske had Berlin "undergo a Smith System retraining session . . . ."  (*Id.*, Notes.)  In making its decision, Penske took into account the entirety

of Berlin's employment with the company and his "outstanding efforts, a 9-year history involving only one accident, and [his] willingness to assist in the accident investigation." (Smith Aff. ¶ 13.) Huesman was in the position of Safety Manager for Penske and performed the investigation of the preventability of Berlin's accident.

Terry Caudle, a white male driver, had the following driving history with Penske: a log falsification warning on February 12, 2001; six log violations within a year which resulted in a one day suspension; a written warning for failure to report a speeding citation on June 1, 2004; a written warning for a citation at a roadside inspection for running a flat tire on March 19, 2004; a written warning for having a headlight out and no emergency triangles during a roadside inspection on April 30, 2003; and suspension for "dropping a loaded trailer at the Big Lots store in Prattville, Al., then taking his truck to his house." (Pl.'s Ex. 33., Violations and Suspensions.) Moreover, Caudle was involved in a total of three accidents before his termination from Penske.

On March 21, 2001, Caudle was involved in a "questionable preventability" accident. (Pl.'s Ex. 16., Notes) Caudle hit a vehicle in a Big Lots parking lot that he thought had passed. However, the vehicle had stopped and proceeded to reverse its path. Caudle was hit when the vehicle reversed its path. Caudle incurred $5,230.86 in damages. Wesley Heusman investigated the preventability of the accident and determined that no disciplinary action would be taken against Caudle. On May 1, 2001, Caudle allegedly fell sleep while driving his truck. As a consequence , Caudle ran into a grass median and slammed into a highway sign. Penske again ruled that this accident was preventable because Caudle "was not aware of [his] surroundings, not focussing [sic] down the road, and not maintaining proper space around your trailer." (Pl.'s Ex. 33., Memo from Heusman.) There was no damage to Caudle's vehicle. This accident was Caudle's third preventable accident within

10

a span of 36 months.  Caudle was suspended for three days as a result of the accident and an accumulation of violations.  Finally, on September 27, 2004, Caudle was traveling Highway 19 when he came upon a "slow moving vehicle" and "did not realize just how slow [the vehicle] was going until I was just about upon him."  (Def.'s  Ex. D., Driver's Accident Statement.)  Caudle veered to avoid, but the trailer rear ended the vehicle.  A Florida police officer cited Caudle for careless driving in conjunction with the accident.  Penske terminated Caudle on October 5, 2004 "after an accident coupled with over three years of continuous and repeated violations and suspensions."  (Def.'s Rep. Pl.'s Resp. Summ. Judg. at 13.)

Jeff Boone, a white male driver, received a citation for passing a school bus on October 18, 2001; received a ten, eleven, and fourteen hour violation from Penske; exceeded the speed limit posted by the terminal manager; received a citation from the Birmingham Police Department indicating that he had an unsecured fire extinguisher on his truck; and received a violation for his tractor being in non-compliance with an inspection on October 13, 2001.  Boone was also involved in a preventable accident in Enterprise, Alabama, in which he collided with a pick up truck.  Boone admitted to not seeing the truck, and damages, according to Lewis, totaled $6,187.50.  Gary Nuckolls investigated the preventability of Boone's accident, and Jason Smith and Jeff Moss reviewed the accident.  According to the Supplemental Accident Analysis Report prepared by Nuckolls, Smith, and Moss, Boone admitted fault as to his role in the accident.  Penske disciplined Boone with a one half day suspension, a Smith System retrain, and a written warning.  Additionally, on October 12, 2002, Boone, while traveling on Interstate 10, hit a coyote with his tractor.  The Supplemental Accident Analysis Report shows that the safety committee determined that Boone used all prongs of the Smith System Keys.  Further, on December 18, 2002, Boone 's left recap came off of his truck.

A car traveling beside Boone hit the recap and blew a tire.  The supervisory team of Moss, Smith, and Nuckolls determined that the accident was non-preventable and concluded that no discipline was necessary for Boone.  Finally, on November 7, 2003, Boone was waiting for store personnel to arrive at a Big Lots Store, when a man came from behind the shadows with an object in his hand.  According to the Vehicle Accident Report, Boone was afraid of the situation and immediately jumped into his tractor.  Trying to flee the scene as quickly as possible, Boone rounded a corner and hit two of the trailer's tires on the cub.  The supervisory team of Moss, Smith, and Nuckolls determined that the accident was non-preventable and concluded that no discipline was necessary for Boone.

        As evidence of the alleged environment of racism at Penske, Lewis testified that a Penske mechanic hit three drivers' personal vehicles.  Moss had Penske fix two drivers' vehicles, but not Lewis's vehicle.  Theodore Jenkins, a Penske mechanic, stated that Lewis's accident occurred in the parking lot of the Penske shop.  Jenkins believed that "Rodney drove over one of [his] screwdrivers. . . ."  (Decl. Jenkins. ¶ 6.)  Further, Jenkins stated that he had no information as to whether Penske fixed Lewis's vehicle, but he relayed that the "policy [at Penske] is that if you park your personal vehicle in our lot, you do so at your own risk."  (*Id.*)  Lewis also suggests that a noose incident at the mechanic's shop is evidence of an environment of racism.  Allegedly, "someone hung up a noose as a Halloween prank."  (*Id.* at ¶ 8.)  Jenkins, who saw the noose, stated that "Lewis was not there when I saw the noose, and I did not know he was supposed to have ever seen it."  (*Id.* at ¶ 7.)  According to Jenkins,  no Penske supervisors were involved with the alleged prank.  Lewis testified that this incident occurred at the mechanic's shop while he was off duty.  When questioned as to whether he was upset by seeing the noose, Lewis responded "No.  Why would I be upset by it?"

12

(Pl.'s Dep. 200:13-21.)  However, Lewis later admitted that he was lying when he stated that he was not upset by the image of the noose.  (*Id.* 390:30 - 391:5.)  Lewis did testify that he had heard no individual at the Penske facility make any racial slur.  (*Id.* 87:19-21.)  Finally, Lewis and other African-American drivers testified that white drivers at Penske receive better runs than black drivers.

D.     ***Retaliation***

As discussed *supra*, Lewis filed an EEOC complaint against Penske in 2002.  Lewis argues that he has been retaliated against for filing the complaint and offers evidence in support of his assertion.  For instance, Jason Smith, who claims that he had knowledge of Lewis's EEOC complaint, would greet Lewis with the words "here comes trouble."  (Pl.'s Dep. 85:23-86:12; 87:5-7.)  Additionally, Robert Davis heard Moss refer to Lewis and other drivers who filed the EEOC complaint as "the dirty dozen."  (Davis Aff. ¶ 2.)  Moss allegedly told Davis that he was referring to the drivers who filed the complaint.  Rick Taylor, Regional Human Resources Manager for Penske, had actual knowledge of Lewis's EEOC complaint.  When the drivers returned to work following the first EEOC charge, Lewis overheard Taylor say that "[s]omebody on this fleet was going to pay for what happened."  (Pl.'s Dep. 303:17-304:5.)  Moss, Smith, Taylor, Stovall, and Moore all had knowledge that Lewis had filed an EEOC complaint alleging racial discrimination against Penske.

On January 14, 2004, Lewis filed a Charge of Discrimination with the EEOC. Lewis has exhausted all available administrative remedies with the EEOC.  He filed this lawsuit on October 20, 2004.

## II. JURISDICTION AND VENUE

Because this case arises under Section 1981 and Title VII, the court exercises subject matter

13

jurisdiction over this action pursuant to 28 U.S.C. § 1331.  The parties do not contest personal jurisdiction or venue, and the court finds a sufficient basis for each.

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[T]he court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Celotex Corp.*, 477 U.S. at 322-23.

Once the moving party has met its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *Id*. at 324.  To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v.  Zenith Radio Corp*., 475 U.S. 574, 586 (1986).  A genuine factual dispute exists if the "jury could return a verdict for the non-moving party."  *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354,

14

1358 (11th Cir. 1999) (citation omitted).  After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

## IV.  DISCUSSION

### A.     *Discriminatory Discharge and Retaliation*

Plaintiff brings this action under Title VII and Section 1981.  Title VII and Section 1981 have "the same requirements of proof and use the same analytical framework . . . ."  *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  The court's discussion will address only the framework of Title VII because that rationale also addresses Plaintiff's claim under Section 1981.

### 1.     **Discriminatory Discharge**

Title VII reads in pertinent part:

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e-2(a).  "In order to establish a case under Title VII, a plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence or statistical evidence.  The analytical framework and burden of production varies depending on the method of proof chosen."  *A.B.E.L. Servs., Inc.,* 161 F.3d at 1330.  Lewis does not provide, nor does the court find, direct evidence of discriminatory intent on the part of Penske.  Lewis does, however, argue that he has proffered enough circumstantial evidence to overcome Penske's motion for summary judgment.

15

A plaintiff who relies on circumstantial evidence to support a claim of a Title VII violation must fulfill the three-step framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). "The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of [gender, race, and national origin] discrimination." *McDonnell Douglas Corp.,* 411 U.S. at 802. The plaintiff must establish that "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class." *Maynard v. Bd. of Regents of the Div. of Univ. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003). When an employee establishes a prima facie case of discrimination, then a presumption arises that the employer discriminated against the employee in violation of Title VII. *See Chapman*, 229 F.3d at 1024. To rebut the presumption, the defendant "must articulate a legitimate, nondiscriminatory reason for the challenged employment action." *Id*. The employer has only the burden of production; "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id*. (citation omitted). Once the defendant employer carries the burden of production by articulating a nondiscriminatory reason, then "the presumption of discrimination is eliminated and 'the plaintiff has the opportunity to come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision.'" *Chapman*, 229 F.3d at 1024 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)). Summary judgment will be granted in favor of the defendant if the plaintiff fails to produce evidence that is sufficient for a reasonable fact finder to conclude that each of the employer's

16

proffered nondiscriminatory reasons is pretextual.  *Id.* at 1024-25.

There is no dispute that Lewis meets the first three prongs of the *McDonnell Douglas* framework - Lewis is a member of a protected class, an African-American; he was qualified for the position of truck driver with the company; and he was terminated from Penske.  To complete his *prima facie* case, Lewis must show that Penske "treated similarly situated employees outside his classification more favorably than [himself]."  *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).  "To make a comparison of the plaintiff's treatment to that of [non-minority] employees, the plaintiff must show that he and the employees are similarly situated in *all* relevant respects."  *Id.* (citations omitted) (emphasis added).  Lewis can also establish the fourth prong of a *prima facie* case by evidence of his replacement by someone outside of his protected class.  *See Maynard,* 342 F.3d at 1289.[3]

Penske terminated Lewis for a major, preventable accident with damages in excess of $18,000, supposed untruths by Lewis to Penske about the cause of the accident, and a "past history of unsafe acts . . . ."  (Pl.'s Ex. D., Discharge Template.)  A snapshot of Lewis's history with Penske shows that he was cited for a ten hour violation, received a citation for not having his log book current, participated in unsafe practices, falsified entries in his logbook, "habitually called in sick at the last minute," was cited for an overweight truck, and was cited four times for speeding in his personal vehicle.  (Pl.'s Ex. A., NeSmith Memorandum.)  Lewis emphasizes various awards and

_____

[3]  Penske contends that it replaced Lewis with Joe Bailey, an African-American male.  Lewis argues that "[Lewis] was terminated on January 9, 2004, almost six months after Bailey was hired as his alleged 'replacement.'"(Pl.'s Br. Resp. Def.'s Summ. Judg. at 19 (citation omitted)).  Bailey "immediately took over Rodney's truck routes.  In fact, Joe drove Rodney's routes until March 15, 2005, when Penske hired Ronald Hayduke [a white male]."  (Smith. Aff. ¶ 7.)  Bailey took over Lewis's routes and ran them for a full year.  He was therefore not a temporary employee used as a ruse to subvert Title VII.  *Cf. Bell v. Capital Veneer Works, Inc.*, No. 2:04-CV-627-WKW, 2006 WL 626068 (M.D. Ala. March 13, 2006), *aff'd* No. 06-12253, 2007 WL 245875 (11th Cir. Jan. 30, 2007).

commendations from Penske as evidence that his negative history factors are pretextual.  The commendations awarded to Lewis by Penske were, however, early in his employment with the company and are in any event insufficient to prove pretext.

Lewis points to Paul Berlin, Terry Caudle, and Jeff Boone as proper comparators.  However, none of these individuals were involved in nearly identical behavior as Lewis.  Boone was involved in a major preventable accident where damages totaled $6,187.50 and was involved in three other accidents throughout his history with Penske that were deemed non-preventable by a vote of the safety committee.  Moreover, Boone, although cited for several infractions by Penske and by police officers, never engaged in deceptive practices like Lewis.  Boone readily admitted fault as to his involvement with his preventable accident, and was never cited for log falsification.  Finally, unlike Lewis, Boone was never cited for a safety violation.

The second comparator, Caudle, was involved in a major "questionably preventable" accident, a minor preventable accident, and a preventable accident.  Caudle, like Lewis, had a spotty history with Penske and engaged in deception.  He had six log violations within a year, falsified his log entries, did not report a speeding citation, was cited for running a flat tire, received a warning for having a headlight out, and engaged in unprofessional behavior at a Big Lots store.  However, Caudle was never given a reprimand or citation for unsafe practices, unlike Lewis.  Moreover, Penske terminated Caudle after his third accident that was determined by the safety committee to be preventable.  Although Penske terminated Caudle after his third accident, in reality the company terminated him after his first preventable accident.  Moreover, in addition to the accident, Penske's decision to terminate Caudle was based on his unfavorable history with the company.  Caudle was not treated any differently than Lewis; on the contrary, Caudle and Lewis were terminated for

18

essentially similar behavior and a similar background of infractions, although Lewis arguably had more egregious violations than Caudle.

The third comparator, Berlin, was involved in a major preventable accident that involved damages totaling in excess of $18,000 and an over-the-road petroleum spill. Berlin also had a speeding violation, an accident before his tenure with Penske, a log violation for exceeding the speed limit, multiple hour violations, a minor preventable accident, and an alleged violent incident with a Penske security guard. As with the other alleged comparators, Berlin was never cited for unsafe practices nor did he engage in deceptive behavior. On the contrary, Penske allowed Berlin to stay with the company after the major preventable accident specifically because of his "willingness to assist in the accident investigation." (Smith Aff. ¶ 13.)

Even if the court accepts that the alleged comparators engaged in nearly identical activities and were not disciplined as harshly as Lewis, different decision makers determined the discipline of the comparators and they are therefore not nearly identical to Lewis for Eleventh Circuit precedent. *See Mack v. ST Mobile Aerospace Eng'r, Inc.*, 195 Fed. Appx. 829, 844 (11th Cir. 2006) (finding that comparators were not nearly identical to plaintiff because plaintiff reported to different supervisors); *see also Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1261 n.5 (11th Cir. 2001) ("[D]ifferences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of employment discrimination."). It is undisputed that Penske engages in numerous steps before an individual is terminated. The decision regarding accident preventability begins with the recommendation of the safety committee. No employee would be disciplined if the safety committee does not recommend that the accident was preventable. (*See* Taylor Aff. ¶ 12.) Lewis's safety committee was composed of Smith, Nuckolls, Beck, Franklin, Stovall, Arthur, and Moore.

Beck, Franklin, Stovall, Arthur, and Moore were drivers who worked with Lewis.  Franklin, Stovall, and Moore are African American, while Beck and Arthur are white.  Moreover, Nuckolls performed the safety evaluation of Lewis's accident in his position as Safety Manager for Penske.  On the other hand, Heusman was Safety Manager for Penske and investigated the preventability of Berlin's accident and Caudle's first "questionable preventability" accident.  Although Nuckolls investigated each of Boone's accidents, the safety committee was more than likely composed of different individuals.  (See Nuckolls Aff. ¶ 7 ("[T]he Safety Committee that unanimously concluded that Rodney's accident was preventable would not necessarily be - - and in fact would not likely be - - the same Committee that decided the preventability of accidents occurring in any other year, or maybe even in the same year."))[4]   Additionally, a discharge template is used which garners input from the Human Resources Manager before termination of an employee.

Even if Lewis could establish a *prima facie* case of discrimination, Penske offers a nondiscriminatory, legitimate reason as to why it terminated his employment.  In analyzing whether a plaintiff rebuts an employer's legitimate, non-discriminatory reason for termination, it is the district court's duty to "evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (internal quotation marks and citation omitted).

Penske terminated Lewis because of his "past history of unsafe acts, and the nature and severity of [the major, preventable accident]. . . ." (Def.'s Ex. D., Penske Discharge Decision

---

[4]  Lewis has not disputed at oral argument nor in any briefing to the court that the safety committee for his comparators was more than likely made up of different individuals than his own.

Template.)  Lewis argues that Penske terminated him for an illegitimate reason.  Essentially, Lewis attempts to establish that the accident was not preventable.  Lewis submitted a litany of DVIRs indicating that the truck that Penske gave him to drive had various problems.  Lewis argues that if not for the truck being defective, then the accident would not have happened in the manner in which it did.  However, Lewis has provided no evidence that discrimination played any part in the assignment of the truck to him by Penske nor of the decision to terminate him after the accident. Penske avers that trucks are given to drivers based on seniority status.  Lewis does not dispute that this was Penske's policy, and the court does not find this explanation lacks merit.  Lewis, by submitting evidence that his truck was allegedly defective and testifying that the accident happened because of the truck, asks this court to second-guess Penske's safety committee's decision that his accident was preventable.  Lewis, however, must meet any proffered explanation for his termination head-on, rather than quarrel with its reasonableness, and prove that discrimination was somehow lurking in the background.  *See Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000). Lewis has also not rebutted Nuckoll's testimony that "accident evaluations were so confidential that the Committee was never given or discussed a driver's name.  Rather, each accident was assigned a number."  (Nuckolls Aff. ¶ 9.)  It is nearly impossible to conclude that members of the Safety Committee based their decision on a discriminatory factor, when the accident investigations were anonymous.

Lewis further argues that part of the decision by Penske to terminate him was based on supposed untruths proffered as to the cause of the accident.  Lewis vehemently denies that he was anything other than honest in his conversations following the accident.  It is well established, however, that "[Title VII does not] require the employer to have good cause for its decisions.  The

21

employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984) (citations omitted). Further, Lewis has not provided any evidence, other than the supposed defectiveness of his truck, that Penske did not honestly believe that he was untruthful in his recollection of the accident. On the contrary, Lewis was cited various times for other deceptive behavior, *e.g.* log falsification. The court finds that Lewis has failed to establish specific facts from which a reasonable jury could conclude that discrimination motivated Penske's decision to terminate his employment.

Finally, Lewis provides additional alleged circumstantial evidence suggesting that Penske terminated him based upon his race: allegations that Penske fixed two other employees' personal vehicles and not his own after an accident in Penske's mechanic's lot; the hangman's noose incident; and statements from other African-American drivers that white drivers receive better runs. Lewis's evidence hints of an attempt to establish a hostile work environment. As to his personal accident, Lewis allegedly drove over a screwdriver while in the parking lot of Penske. Penske's policy was that "if you park your personal vehicle in [the Penske] lot, you do so at your own risk." (Jenkins Decl. ¶ 6.) Lewis has not disputed that this was Penske's policy, nor has he provided sufficient evidence indicating that discriminatory animus motivated Penske's supposed decision to not fix his personal vehicle. As to the noose incident, no supervisor who would have any input as to the decision-making process in Lewis's termination was involved with the incident. Further, Lewis was off-duty and outside of his place of employment when the incident occurred, and Lewis testified initially that the incident did not bother him. Finally, statements from other African-American drivers detailing that white drivers receive better runs is of no relevance to Lewis's allegations of

22

discriminatory discharge.  The African-American drivers, William Crawford, Gregory Blocton, and Douglas Birl, did not comment on any specifics of Lewis's employment with or termination from Penske, nor did they comment as to any supervisory employee making remarks to or about Lewis. On the contrary, Lewis testified that he never heard any racial slurs made by any employee of Penske.  The court finds the aforementioned evidence insufficient to establish pretext.

From the evidence submitted, the court finds that Penske has provided a legitimate, nondiscriminatory reason for Lewis's termination, and that Lewis has failed to establish pretext in opposition.  Therefore, Penske is entitled to summary judgment on Lewis's Title VII and Section 1981 claims of discriminatory discharge.

### 2.    Retaliation

"Under Title VII, it is an unlawful employment practice for an employer to discriminate against an employee 'because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Coutu v. Martin County Bd. of County Com'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995) (quoting 42 U.S.C. § 2000e-3(a)).)  For a plaintiff to establish a prima facie case of retaliation claim under Title VII, he must show "(1) that [he] engaged in statutorily protected activity, (2) that an adverse employment action occurred, and (3) that the adverse action was causally related to the plaintiff's protected activities." *Id.*   "The burden of production then shifts to the defendant to establish non-retaliatory reasons for the employment actions.  The plaintiff can refute these reasons by proving that they are pretextual." *E.E.O.C. v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1572 (11th Cir. 1993) (citation omitted).

The court concludes that Lewis has established his *prima facie* case of retaliation under Title VII.  Lewis has established that he engaged in a protected activity by filing an EEOC complaint of race discrimination in 2002.  *See Bass v. Bd. of County Commr's of Orange County, Fla.*, 256 F.3d 1095, 1117 (11th Cir. 2001).  Lewis has also established that he was subjected to an adverse employment decision, specifically he was terminated from his employment with Penske.  Finally, for purposes of his prima facie case of retaliation, the court finds that Lewis has provided sufficient evidence of the casual connection between Penske's decision to terminate and his protected activity of filing an EEOC complaint.

The casual connection is the only disputed element of Lewis's retaliation claim.  The Eleventh Circuit has directed the district courts to interpret "the casual link requirement broadly; a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated."  *Reichhold Chemicals, Inc.*, 988 F.2d at 1571-1572.  "[A] plaintiff may satisfy the casual link in a retaliation case by establishing that 'the employer was actually aware of the protected expression at the time it took the adverse employment action.'" *Gary v. Hale*, 212 Fed. Appx. 952, 957 (11th Cir. 2007) (citing *Clover v. Total Sys. Serv. Inc.*, 176 F.2d 1346, 1354 (11th Cir. 1999)).  "Such awareness may be established either by direct evidence, or by circumstantial evidence, such as proximity in time."  *Id.* (internal citations omitted).[5]

Lewis has established with direct evidence that at least a majority of the decision makers knew of his EEOC complaint when their decision was rendered.  Rick Taylor, Regional Human

---

[5] The *Hale* court stated that it was error for a district court to "inquir[e] into the temporal proximity between the protected activity and the adverse employment decision . . ." when there is evidence of direct knowledge on the part of an employer.  *Hale*, 212 Fed. Appx. at 958, n.3.  Temporal proximity is properly considered as circumstantial evidence, and is a proper factor when a plaintiff cannot establish a decision-maker's awareness of the protected activity.

Resources Manager, testified that he had knowledge of Lewis's EEOC charge.  (Taylor Aff. ¶¶ 7 -

10.)  Following Lewis and the other driver's reinstatement after the 2001 EEOC charge, Taylor was

overheard saying that "[s]omebody on this fleet is going to pay for what happened."  (Pl.'s Dep.

303:17-304:5.)  Furthermore, Taylor was involved, albeit in a small way, with the final decision to

terminate Lewis.  (Taylor Aff. ¶¶ 11 - 12.)  Moreover, Anthony Stovall and Leon Moore, members

of the Safety Committee and participants in the EEOC charge, had knowledge of the complaint at

the time of their decision.  (Stovall Aff. ¶ 9; 12; Moore Aff. ¶ 3; 7.)  Moss, Logistics Center Manager

and member of the Safety Committee, had knowledge of the complaint at the time of the

committee's decision.  (Moss. Aff. ¶ 9.)  Moss was overheard referring to Lewis and the other

drivers who filed the EEOC charge as the "dirty dozen."  (Davis Aff. ¶ 2.)   Finally, Jason Smith,

Logistics Center Supervisor and member of the Safety Committee, had knowledge of the complaint

at the time of the Committee's decision.  (Smith Aff. ¶ 17.)  Although Smith was not employed with

Penske at the time the EEOC charge was commenced, he did testify that he reviewed the records and

was knowledgeable of the complaint.  (*Id.*)  Smith also greeted Lewis with the phrase, "Here comes

trouble."  (Pl.'s Dep. 85:23-86:12; 87:5-7.)  Although each individual testified that they did not

discuss the EEOC charge at the time of their decision to terminate Lewis, it is undeniable that

various members of the committee knew of the charge and it is not unreasonable for the court to

conclude under Rule 56 standards that Lewis's termination and his protected activity were not

wholly unrelated.  This evidence alone satisfies Lewis's *prima facie* case of retaliation.

Although Lewis has firmly established his *prima facie* case, the court concludes that Penske

has proffered a legitimate, non-discriminatory reason for terminating Lewis.  As stated previously

in the discriminatory discharge section of the opinion, Lewis was terminated from Penske because

of his "past history of unsafe acts, and the nature and severity of [the major, preventable accident].

. . ." (Def.'s Ex. D., Penske Discharge Decision Template.)  Penske's Procedural Manual explicitly

states that "[a] major preventable accident will be grounds for discharge . . . ." (Pl.'s Ex. 21., Penske

Procedure.)  Additionally, there were discrepancies in Lewis's recap of the facts of the accident.  The

Safety Committee found unanimously that the accident was preventable, as did various members of

the Penske hierarchy.  It bears repeating that it is not this court's job to second-guess the business

decision of Penske.  The court concludes that Lewis does not provide any evidence indicating that

discrimination played any part in the Committee's decision.  Moreover, the evidence does not

establish that Penske did not honestly believe that Lewis was untruthful in his explanation of the

accident.  *See Jones v. U.S. Dept. Of Veterans Affairs*, 213 Fed. Appx. 933 (11th Cir. 2007) (holding

that a plaintiff terminated for being untrustworthy and uncooperative failed to overcome summary

judgment because "although [the plaintiff's] evidence may raise a question of fact about whether her

termination was mistaken or unfair, she has produced no evidence disputing [the defendant's]

assertions of honest reliance on the proffered reasons.")

Because Lewis has failed to rebut Penske's legitimate, non-discriminatory reason for his

termination, he has failed to establish a claim of retaliation under Title VII.  Therefore, the defendant

is entitled to summary judgment on plaintiff's claim of retaliation.

**B.      *Discovery Abuse***

It is undisputed that Lewis improperly secured copies of Penske personnel records when he

was no longer employed with the company.  Counsel to Lewis unwittingly submitted copies of the

26

personnel records to counsel for Penske in the normal course of discovery.[6]  When queried in his

deposition about how he received the documents, Lewis stated that he did not remember how he

came into possession of them.  (*See* Pl.'s Dep. 381:9-382:6.)  Moreover, when asked who provided

the documents to him, Lewis responded that "nobody" provided any Penske documents to him.  (*Id.*

383:20 - 384:15.) However, in his subsequent answers to Penske's interrogatories, Lewis responded:

> After giving this more thought since the time of the deposition, I now
> recall that the documents were obtained from dispatcher, William
> Crawford, sometime during early summer, 2005.  Upon my arrival to
> pick up a load for my present employer from Defendant during third
> shift, Mr. Crawford and I had a discussion.  Information about driving
> records for certain drivers was brought to my attention and
> information regarding the same was accessible in an unlocked filing
> cabinet.  I obtained these documents from Mr. Crawford.

(Pl.'s Answers to Def.'s First Interrogatories and Request for Production of Documents.)  The court

finds Lewis's flip-flop on the facts wholly incredible.  Further, there is other evidence of Lewis's

discovery duplicity.  Lewis's former co-worker, Anthony Stovall, testified that Lewis "asked me to

use my access to Penske to get him some information and things he needed for this lawsuit . . . . I

know he has asked others to help him this way."  (Stovall Decl., ¶¶ 4-6.)

"Federal courts have the inherent power to impose sanctions on parties, lawyers, or both."

*In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1304 (11th Cir. 2006) (citation omitted).  The court

finds Lewis's undisputed conduct to be an abuse of discovery sufficient to justify serious sanctions.

*See Greviskes v. Universities Research Association, Inc.*, 417 F.3d 752 (7th Cir. 2005) (affirming

the district court's dismissal of the plaintiff's case where, among other things, the plaintiff

participated in fraudulent conduct with respect to the process of discovery.)  Had Lewis's case been

---

[6]  There is no other evidence of the involvement of counsel to Lewis in this episode.

strong enough to survive summary judgment, the court would have strongly considered dismissal of the action as a sanction.  Dismissal would have been all the more likely when considered in light of Lewis's inconsistent statements under oath and various alleged episodes of petty dishonesty in Lewis's employment history, episodes which the court would have investigated more thoroughly had the sanction of dismissal been before it.  Penske has not requested sanctions beyond dismissal, and in the exercise of its discretion in view of the granting of summary judgment to Penske, the court leaves the discovery abuse aspect of the case where it lies.

### V.  CONCLUSION

For the reasons set forth above, it is hereby ORDERED that

1.      Penske's Motion for Summary Judgment (Doc. # 41) is GRANTED;

2.      All claims against Penske are DISMISSED;

3.      Penske's Motion to Strike (Doc. # 66) is DENIED as MOOT by entry of Summary Judgment in their favor;

4.      Lewis's Motions to Strike (Docs. # 59 & 68) are DENIED as MOOT by entry of Summary Judgment in Penske's favor;

5.      All remaining dates and deadlines are CANCELLED; and

6.      An appropriate judgment will be entered.

DONE this 26th day of July, 2007.

        /s/   W.  Keith Watkins
UNITED STATES DISTRICT JUDGE

28